**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF ALASKA**

| | |
|---|---|
| VALERIA MENDOZA SANTIAGO,<br><br>Plaintiff,<br><br>v.<br><br>LAURA HERMOSILLO, *et. al.*,<br><br>Defendants. | 3:26-cv-00132-ACP<br><br>**ORDER DENYING PETITION**<br>[Dkt. 1] |

Valeria Mendoza Santiago filed this Petition Under the Administrative Procedure Act and For Writ of Habeas Corpus against Laura Hermosillo, ICE's acting Field Office Director for Enforcement and Removal Operations for the Seattle Field Office, and other federal officials. Santiago argues that her detention was unlawful because the Government failed to follow published agency guidance about the detention of pregnant women. As explained below, the petition is **DENIED** because Santiago's rights were not violated.

## I. BACKGROUND

Santiago was illegally present in the United Staes when she was detained by ICE on March 20, 2026, and taken to ICE's Anchorage Office. (Dkt. 16-1 at 2; Dkt. 22 at 2) While processing Santiago, ICE agents learned that she was pregnant. (Dkt. 16-1 at 2; Dkt. 22 at 2) After realizing this, Supervisory Detention and Deportation Officer, Bradley Hayes, reached out to Hiland Mountain Correctional Facility to see if it was able to provide pregnant detainees with appropriate accommodations and medical care. (Dkt. 16-1 at 3)

That same day, a Notice to Appear (NTA) was issued, which alleged that Santiago was ineligible for admission to the United States. (*Id.*) After the NTA was issued, ICE began preparing to transfer Santiago to the Northwest ICE Processing Center in Tacoma. (*Id.*) Hayes then contacted the processing center to see if it was able to provide pregnant detainees with appropriate accommodations and care. (*Id.*)

Before she was transferred to Tacoma, Santiago filed this petition claiming that her detention was unlawful because ICE failed to follow ICE Directive 11032.4. (*See* Dkt. 1) That Directive provides internal policy guidance about identifying and monitoring pregnant, postpartum, and nursing detainees. *See* U.S. Immigration and Customs Enforcement, *ICE Directive 11032.4: The Identification and Monitoring of Pregnant, Postpartum, and Nursing Individuals* (July 1, 2021). It states that:

> Generally, ICE should not detain, arrest, or take into custody for an administrative violation of the immigration laws individuals known to be pregnant, postpartum, or nursing unless release is prohibited by law or exceptional circumstances exist. ICE officers and agents should carefully weigh the decision to issue a detainer, arrest, or take into custody for an administrative violation of the immigration laws an individual who is known to be pregnant, postpartum, or nursing.

*Id.* at 1 (internal footnote omitted).

The Directive compliments ICE's national detention standards to ensure that pregnant, postpartum, and nursing detainees "are effectively identified, monitored, tracked, and housed in an appropriate facility to manage their care." *Id.* The Directive continues that "[i]n the very limited circumstances in which detention is necessary and appropriate, ICE must monitor individuals who are pregnant postpartum and nursing in ICE custody for general health and well-being [and] ensure [they] are housed in facilities suitable for their

medical and mental health needs." *Id.* It also states that detention may only be approved by the Field Office Director or a designated Assistant FOD. *Id.* at 2.

According to the Directive, when ICE discovers that someone who is already in custody is pregnant, postpartum, or nursing, they should "immediately notify the FOD, or designee, and the appropriate medical staff . . . to determine if continued detention is appropriate." *Id.* at 2. The Directive also generally describes identification, notification, and tracking procedures; restrictions on the use of restraints; facility assessments; and custody re-evaluation. *See id.* The last paragraph is a disclaimer stating that the Directive is "internal ICE policy guidance" that does not "create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* at 9. That disclaimer also provides that "no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE." *Id.*

Santiago moved for a temporary restraining order the same day she filed her petition. (Dkt. 3) The District Court granted that motion and prohibited ICE from transferring Santiago outside the District of Alaska. (Dkt. 7) She was then released from custody and placed on supervised release on March 23, 2026. (Dkt. 9 at 2) On March 26, the TRO was converted into a preliminary injunction by agreement of the parties. (Dkt. 11; Dkt. 15) The preliminary injunction expired on April 24, and Santiago apparently remains on supervised release.[1] (*See* Dkt. 15; Dkt. 16-1 at 3)

---

[1] The Parties' filings do not give any indication that Santiago's detention status has changed as of the date of this Order.

On August 26, Santiago appeared before an Immigration Court, which found her removable as charged in the NTA. (Dkt. 31 at 1) However, Santiago informed the Immigration Court that she intends to seek asylum relief, so removal proceedings were continued to a later date, likely in Spring 2027. (*Id.* at 2)

## II. LEGAL ARGUMENTS

According to Santiago, her detention is unlawful under the Administrative Procedure Act because ICE "disregarded the agency's own binding custody-review framework for pregnant detainees." (Dkt. 1 at 6) She also argues that the failure to abide by Directive 11032.4 violated both her procedural and substantive due process rights under the Fifth Amendment. (*Id.* at 7-9).

The Government counters that the Directive is merely internal policy guidance and thus confers no substantive rights. (Dkt. 16 at 6) It also argues that Santiago's detention is not reviewable under the APA, that her habeas petition was mooted by her release, and that her due rights were not violated by her brief detention. (*See id.* at 1-15)

Santiago responds that her detention is reviewable both as a habeas petition and under the APA, and that even if it were not, "habeas still lies to challenge detention maintained contrary to governing law, agency procedure, and constitutional limits." (Dkt. 22 at 6, 16-17) She also argues that her habeas petition is not mooted by her release because ICE could detain her again. (Dkt. 22 at 4-5)

# III. ANALYSIS

## A. Santiago's detention is not reviewable under the APA.

The APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Accordingly, "federal courts lack jurisdiction over APA challenges whenever Congress has provided another 'adequate remedy.'" *Brem-Air Disposal v. Cohen*, 156 F.3d 1002, 1004 (9th Cir. 1998). The key inquiry is whether Congress has precluded APA review by providing such a remedy. *Id.* That happens when the alternative remedy gives the petitioner standing to seek the same relief, even if the alternative imposes additional procedural hurdles. *Id.* at 1004-05.

The Supreme Court recently weighed in on whether immigration detainees may seek relief under the APA. In *Trump v. J. G. G.*, the petitioners were detained under the Alien Enemies Act and challenged their detention and removal under the APA. 604 U.S. 670, 671 (2025). The Court held that while the detainees did not "formally request release for confinement . . . their claims for relief 'necessarily imply the invalidity' of their confinement" and thus fell "within the 'core' of the writ of habeas corpus and [] must be brought in habeas." *Id.* at 672. As Justice Kavanaugh explained, given the availability of habeas relief "and given 5 U.S.C. § 704, which states that claims under the APA are not available when there is another 'adequate remedy in a court,' . . . habeas corpus, not the APA, is the proper vehicle here." *Id.* at 674 (Kavanaugh J., concurring).

While that opinion dealt with review under the "AEA, a statute which 'largely preclude[s] judicial review,'" the same reasoning applies in this case. *Id.* (alteration in

original) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163-64 (1948)). "Habeas is at its core a remedy for unlawful executive discretion." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). A detainee is entitled to petition for the writ if they are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). And it has been established that habeas can be used to challenge removal or detention on the grounds that an administrative agency failed to exercise its discretion in accordance with existing regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 261, 266-67 (1954).

Here, Santiago frames her APA motion as a challenge under *Accardi*, but that case involved a habeas challenge. (Dkt. 1 at 6) Moreover, Santiago is only challenging her detention and not her removal, meaning that the relief she seeks falls directly within the "core" of the writ. (*See id.* at 10) Because she can challenge her detention through habeas, an adequate alternative remedy exists, and Santiago may not challenge her detention through the APA.

**B. Santiago's habeas petition is not moot.**

The Government contends that Santiago's petition is moot because "she is currently out of custody and her movements are unrestricted." (Dkt. 16 at 12) According to the Government, this means that "a favorable ruling for [p]etitioner would change nothing." (*Id.*) Santiago responds that her petition is not moot without an assurance that she will not be detained again. (Dkt. 22 at 4-5)

Although a petitioner must be in custody at the time a habeas petition is filed, their release does not automatically moot the petition. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

But for the case to proceed, the petitioner "must continue to have a 'personal stake in the outcome' of the suit." *Id.* (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-78 (1990)). This requires an injury "likely to be redressed by a favorable judicial decision." *Id.* (quoting *Lewis*, 494 U.S. at 477). Under this framework, the Supreme Court has held that a habeas petition is not moot if the Government has discretion to re-detain the petitioner and a favorable ruling would prevent detention on the same grounds. *Clark v. Martinez*, 543 U.S. 371, 376 n. 3 (2005) (holding that an immigration detainee's petition was not moot despite their parole because release was limited to a year and could be revoked at the Government's discretion). Thus, absent substantive or procedural limits on the Government's discretion, a habeas petition does not automatically become moot upon an immigration detainee's release. *See Rodriquez v. Hayes*, 591 F.3d 1105, 1117 (9th Cir. 2010).

Even though Santiago has been released, the Government could re-detain Santiago for her unlawful presence within the United States. Thus, Santiago continues to have a personal stake in the outcome of her petition, and it is not moot.

**C. Santiago's petition is denied because her detention was not unlawful.**

Santiago raises two grounds for habeas relief. First, she argues that ICE detained her in violation of its own custody-review framework for dealing with pregnant detainees. (Dkt. 1 at 6 [citing *Accardi*, 347 U.S. at 260]) Second, she argues that her dentition violates the Due Process Clause of the Fifth Amendment. (*Id.* at 2) Because both arguments assert that her custody was unlawful, either would support habeas relief under 28 U.S.C. §

2241(c)(3). The two claims substantially overlap because the alleged failure to follow the custody-review framework is the core of both claims. (Dkt. 1)

Federal courts may grant habeas relief to a person "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). As a general matter, detention during immigration proceedings does not itself offend the Constitution. *See Demore v. Kim*, 538 U.S. 510, 523 (2003) ("[T]his Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process."). Nor does it generally offend federal law. In fact, Section 235 of the Immigration and Nationality Act imposes mandatory detention "in the case of an alien who is an applicant for admission" unless they are "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A); *see Jennings v. Rodriquez*, 582 U.S. 281, 303 (2018). Likewise, Section 236 authorizes arrest and detention "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).

In this case, the parties disagree on which provision applies and dispute whether detention is mandated by federal law. (*See* Dkt. 16 at 8; Dkt. 22 at 13) The Ninth Circuit has recently resolved that dispute, holding that "unadmitted aliens entering the United States at the border" are subject to Section 235(b)(2)(A) and that "unadmitted aliens present in the interior of the country" are subject to Section 236.[2] *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160, 1193 (9th Cir. 2026). Because no one disputes that Santiago was already

[2] Briefing in this case was completed before the Ninth Circuit decided *Rodriquez Vazquez*. (*See* Dkt. 26) Hermosillo asserts that she understood 8 U.S.C. § 1225(b)(2)(A) to mandate Santiago's detention at the time she was detained. (*See* Dkt. 16 at 8 [citing *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026)]).

in Alaska when she was detained, Section 236 applies. (*See* Dkt. 16-1 at 2; Dkt. 22 at 2) And even though Section 236 does not mandate Santiago's detention, it certainly authorizes it. *See* 8 U.S.C. § 1226(a). Thus, before Santiago's petition may be granted, she must show that her detention was unlawful under *Accardi* or the Due Process Clause.

**1. Santiago's detention was not unlawful under *Accardi*.**

Under *Accardi*, administrative agencies are required to exercise their discretion in a way that is consistent with existing regulations. 347 U.S. at 266-68. This extends to internal agency guidance. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent on agencies to follow their own procedures . . . even where the internal procedures are possibility more rigorous than otherwise would be required."). Thus, an agency must "adhere to its own internal operating procedures." *Church of Scientology of Calif. v. United States*, 920 F.2d 1481, 1487-88 (9th Cir. 1990). And when the "prescribed procedure is intended to protect the interests of a party before the agency," it must be followed even if the procedure provides more protection than the agency would otherwise be required to provide. *Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998).

*Accardi*'s reach, however, depends on whether the agency intended its guidance to be binding. *See Doucette v. U.S. Dep't of the Interior*, 849 Fed. Appx. 653, 655 (9th Cir. 2021); *also Farrell v. Dep't of the Interior*, 314 F.3d 584, 590 (Fed. Cir. 2002) ("The general consensus is that an agency statement, not issued as a formal regulation, binds the agency only if the agency intended the statement to be binding.") (collecting cases). The text of the guidance document is the primary consideration for determining whether it was

intended to be binding. *See Farrell*, 314 F.3d at 590-91; *Service v. Dulles*, 354 U.S. 363, 376 (1957) (holding that an agency must follow an unpublished manual that "purported to set forth definitely the procedures and standards to be followed"). General statements of policy do not bind an agency. *See United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000).

Additionally, a violation of a regulation or internal procedure only renders an agency's action unlawful if "the violation prejudiced interests . . . protected by the regulation" or procedure. *See United States v. Calderon-Medina*, 591 F.2d 529, 531, 531 & n.6 (9th Cir. 1979) (holding that an alien could not challenge their detention for violating a regulation that expressly said the purpose of the protections it provides was "not to benefit individuals but to ensure the efficient performance of functions by consular posts").

Here, the text of Directive 11032.4 shows that ICE did not intend to create a binding procedure for detaining pregnant women. The Directive states that ICE "[g]enerally . . . should not" detain pregnant individuals and encourages ICE officers and agents to "carefully weigh" that decision. *ICE Directive 11032.4* at 1. Inclusion of the words "generally" and "should" instead of something more mandatory, like "shall," indicate that ICE did not intend to curtail its ability to detain pregnant women when necessary and appropriate. Also, the disclaimer at the end of the policy document expressly states that the Directive is only guidance and that "no limitations are placed by this guidance on the otherwise lawful enforcement . . . prerogatives of ICE." *Id.* at 9. These show that the policy document was not intended to be binding.

Santiago points out that the Directive also uses what she calls "mandatory procedural language." (Dkt. 22 at 9) For example, it says that agents (1) to "must immediately notify" a supervisor upon learning a detainee is pregnant, postpartum, or nursing and (2) seek approval from leadership before detaining them. (Dkt. 1 at 5; Dkt. 22 at 9) According to Santiago, these provisions "meaningfully govern[] ICE's exercise of detention discretion once it becomes aware that a person is pregnant." (Dkt. 22 at 8) But these statements cannot be air-lifted from the Directive and read in isolation. When properly read with the rest of the document, the Directive instructs ICE agents to generally follow the procedures that it sets out, and it includes an express disclaimer that it does not create new individual rights. That is not the type of document that is binding under the *Accardi* framework.

Santiago cites both *Accardi* and *Church of Scientology*, but neither case supports her position. (*Id.*) In *Accardi*, the Supreme Court held that the Board of Immigration Appeals was bound by its own regulations, which vested the Board with independent discretion in appeals from the Attorney General's decision about whether to suspend a deportation. 347 U.S. at 266-67. The petitioner alleged that the Board had rubberstamped the Attorney General's decision not to suspend his deportation rather than exercising that responsibility. *Id.* at 262. The Court held that the "Board's alleged failure to exercise its own discretion, contrary to existing valid regulations," could entitle the petitioner to relief, while emphasizing that it was not "reviewing and reversing the manner in which discretion was exercised." *Id.* at 268.

*Accardi* differs from this case in two important ways. First, the binding effect of the regulations in *Accardi* was undisputed; they were duly promulgated regulations with the force of law. But here, the main question is whether ICE intended the Directive to be binding, and the Directive's text and disclaimer indicate that it did not. Second, the regulation in *Accardi* conferred a right on the petitioner himself: the right to have his appeal decided by the Board's independent judgment. The Directive here, by contrast, governs ICE's internal procedures for handling the detention of pregnant women without creating any process by which a detainee may invoke the document or obtain relief. And the Supreme Court has declined to apply *Accardi* to agency rules adopted to structure the agency's internal decision-making and administration rather than to confer rights on individuals. *See Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39 (1970).

Similarly in *Church of Scientology*, the IRS allegedly did not follow a procedure in its handbook saying that "reasonable forbearance will be exercised" when the taxpayer raises a "reasonable doubt about the accuracy or validity of an assessment." 920 F.2d at 1487. As in *Accardi*, this described a right conferred on an individual: the ability to challenge the IRS's assessment for a particular reason and entitlement to a specific remedy. Here, however, the Directive does not confer a right on individuals and expressly disclaims doing so. *ICE Directive 11032.4* at 9.

Additionally, the language that Santiago relies on most heavily deals with the identification and monitoring of pregnant women. *Id.* at 1-2. So even if isolated language in the Directive could be read to confer rights on individuals (if you squint and ignore the disclaimer), those rights would concern ICE's treatment of pregnant women after it has

exercised its discretion to detain them, not the question at issue here: *whether* the petitioner may be detained in the first place.

Santiago's challenge under *Accardi* thus fails for two reasons. First, the best reading of the Directive's text indicates that it was not intended to curtail ICE's enforcement authority. Second, the Directive deals with internal decision-making; it does not confer substantive rights on individuals.

**2. Santiago's detention did not violate the Due Process Clause.**

Santiago also argues that her detention violated both the procedural and substantive aspects of the Due Process Clause. As to procedural due process, Santiago claims that ICE "violated procedural due process by detaining [her] after learning of her pregnancy without affording the process that ICE itself has deemed necessary for such detention decisions." (Dkt. 1 at 8) Thus, her claim rests on the proposition that ICE violated the Directive. However, the mere failure of an agency to follow its own regulations and operating procedures does not amount to a violation of the Due Process Clause. *Brown v. Holder*, 763 F.3d 1141, 1148 (9th Cir. 2014). Instead, constitutional rights may be violated "when the agency disregard of its rules results in a procedure which in itself impinges upon due process rights." *Id.* at 1149 (quoting *Bates v. Sponberg*, 547 F.2d 325, 329 (6th Cir. 1976)). Santiago does not attempt to explain how ICE's alleged failure to follow the Directive deprived her of due process beyond her assertion that ICE detained her without following internal policy. Because her claim only relies on ICE's alleged failure to follow an internal policy, it is insufficient to establish a violation of due process. *See Id*. ("Therefore, insofar

as Brown relies only on the supposed failure of the INS to follow its regulations and operating procedures, his claim fails.").

As to substantive due process, Santiago argues that her "continued detention . . . in disregard of the agency's own release-oriented policy . . . is arbitrary executive action," and that the detention itself was "punitive, conscience-shocking, or deliberately indifferent to a detainee's known medical condition and heightened vulnerability." (Dkt. 1 at 8) Neither argument is persuasive. First, "only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Here, Directive 11032.4 was not binding, and Santiago does not dispute that she was in the country illegally, so her brief detention could not be characterized as arbitrary or conscience-shocking. (*See* Dkt. 1 at 2) Second, Santiago failed to even discuss or cite the standards that apply to her claims. Her conclusory characterization of her detention is insufficient to sustain any of her allegations under either the Civil Rules or the Rules Governing Habeas Corpus Cases. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Rules Governing Section 2254 Cases in the United States District Courts, Rule 1(b), 2(c). Therefore, Santiago has failed to show that her detention violated her due process rights.

## IV. CONCLUSION

ICE Directive 11032.4 was not binding agency guidance. Thus, Santiago's detention was not unlawful under *Accardi*. Her detention also did not violate the Due Process Clause. Therefore, Santiago's petition is **DENIED**.

IT IS SO ORDERED.

DATED October 30, 2026, at Anchorage, Alaska.

/s/ *Aaron Christian Peterson*
Aaron Christian Peterson
United States District Judge